Mr. Crane is a thyroid cancer patient and he seeks review of the denial of his petition for rulemaking asking the NRC to reconsider its rules that govern the release of thyroid cancer patients in the United States. who have been treated with radioactive iodine. NRC posits that the test here for remand is whether the petition showed such new information that it undermined the factual underpinnings of the rule, which NRC published in 1997. We meet that test. Moreover, under State Farm, the agency did not respond to critical information about the rule in the denial of rulemaking. Well, counsel, you have the threshold question of standing. Yes, sir. Why don't you help us with that? Well, Mr. Crane, I think, meets the requisite Article III purposes. How? Well, he has an actual interest in the scope of issues that would be within the four corners of the rulemaking. I'm sort of procedurally confused about this because what do we know? Do we have an affidavit or a declaration or a pleading or anything that asserts in any detail what Mr. Crane's status is? It's kind of strewn around. I mean, I know at some point he had thyroid cancer and at some point he had recurrence. I'm not sure when. I don't know where that is. And then there's some information in the brief about how likely recurrence is. And then there's this 28-J letter that says he may be having a problem. But it's kind of all strewn around. Fair point, Your Honor. The standing issue as well as timeliness were raised in the NRC's brief. We responded in the reply brief. I think the nearest But don't you have an obligation to establish standing? I mean, it's odd because we have, if this were a case coming from a district court, it would be simple. You'd have an allegation, you'd have a plea. And then there could be a challenge to it. And there could be summary judgment proceedings. There could be fact findings. But here we're coming directly to the Court of Appeals. And I don't know what one does under those circumstances in terms of establishing the facts that establish standing. Well, the nearest case, I think, says that it could be established even by a reply brief. That the interest of the petitioner could be established in a reply brief. If I'm wrong on that, if I'm wrong on the case side, I'll get that case letter. I mean, let's assume that we would agree that if he had any substantial likelihood of recurrence, he would have standing. All right. Then what do we do? We make a finding? You have to make, I mean, I guess I would be happy if you had submitted or even if you did submit an actual declaration of facts. We could certainly submit for the record an affidavit from Mr. Crane and probably even a letter from his doctors. In the response to the government's 28-J letter, we noted the information which came forward after the briefing in the case that Mr. Crane had a blood test earlier this year, I think, that established that he had higher levels of what's called thyroglobulin. Since his thyroid is no longer functioning and was removed, the only thing that could produce this thyroglobulin would be cancer cells in his system. This is a marker in his medical circumstances for thyroid cancer. It doesn't show that it's a recurrence. In fact, the doctors who have treated him have managed to give him additional medicines that have suppressed that. But the fact of the matter is that he is a cancer patient, that he will continue to be a cancer patient. He will continue to be monitored for the rest of his life. What if we asked you to submit a declaration from him and a declaration from his doctor? We could do that. It seems like we'd need so much more. In order to have injury in fact from the rule, let's see, a lot of patients would say, I don't want a rule that coops me up in a hospital. I want to be able to get out. His claim is somewhat different. It's, I don't want to endanger people by being out. I want to be kept in until I'm safe. It seems to me that what he would need in order to have an injury in fact is evidence, not merely a suggestion in a 20HA letter, but sworn evidence, expert report, it might be in the form of a doctor's letter, medical chart that was authenticated. That sort of thing showing, number one, I have this kind of cancer. Number two, they still use the sort of treatment that I was complaining about 12 years ago in the same quantities. That's a big if because treatments change. Number three, I am going to be released from the hospital in a condition so that I'm unsafe to others and that this injures me in some way. And it looks like we're not even close. Well, see, I think that if, well, let me just deal with this in pieces. First, if you wanted additional information for the record, we could provide that. Well, we're not his lawyer. You are. So it's really not up to us to scrape around and find witnesses and evidence. No, but see, the issue that was raised in the most recent Supreme Court case says that you have to measure the standing of the petitioner against the relief that he's seeking. He's not seeking to enjoin the agency's rules. He doesn't need to show, therefore, irreparable harm. This is not an adjudication. So this is not just about him. This is a rulemaking, which by its nature is more generic. But the rulemaking has to apply to him in some way, does it not? Yes, and as a cancer patient who is continuously monitored, who has to go in for annual, and then if something happens, more often monitoring and possibly treatment. He presents the medical facts that anybody else who has had thyroid cancer could present. But we have no idea if there's injury. In fact, to him, we don't even know if treatments are the same. I happen to know that a lot of the stuff that they use radiation for, both from outside in and from inside out, they use much smaller quantities of radiation now than they did 12 years ago. But the technical information in the rule and in the rulemaking documents and the record, I think Your Honor would say that for our purposes, the treatment situation is the same. I'm not aware that there's any difference in the kind of treatment. He would receive radioactive iodine orally. He would be active. If you held a Geiger counter against him, he would produce a signal. Sure. And he would be that way for 100 years. Sure, it's all a question of how much. That's right. And so the issue would be how much and how long and who else is around. But it seems to me that for Article III purposes, the issue is, does he show, is this an academic or some, like a private attorney general's interest in this subject, or is this somebody for whom this is real? And for him, this is real. This is his life. He's a thyroid cancer patient. I'm with you up to this is real, but bring us the next step. What is the direct connection between his current situation and the rule in question or the specific proposal to amend the rule in question? Well, what he's asking the agency to do and what has been part of the record here is that it reconsider its rules that would in effect authorize release of treated patients. You know, the most recent document that he filed in the record says the agency should open the doors and hear from doctors and patients and patient support groups and get the best, latest information. For example, the consistency with international radiation protection standards. There's a hotel issue that's raised in this case that shows that there's a previously unanalyzed pathway out there for the exposure of the public. This is all information that came forward in the limited proceeding that the agency had on his rule. If the ruling of the court is, as the government argues in its brief, that the only person who can have standing is somebody who's actually being treated right now for thyroid cancer, so that they were in the hospital yesterday or they're going in the hospital tomorrow, then I submit nobody will have standing, because the nature of treatment and the nature of the administrative proceeding, the nature of judicial review are such that. Suppose the government's position was, that's not the problem. The problem is that you have not, you had an obligation to come forward with facts showing that you have standing and you haven't done it. But we did point out his, again, the standing was raised by the government's brief.  But does that matter? I mean, don't, isn't it part of establishing that you have a right to come into court, that you allege some facts? Standing could be raised, as you know, at any time, and therefore can be established at any time. But until we know that it's, that it would be a, that it would be an issue in the case, it's not clear that we should be presenting. Even when it's your burden? Well, the burden, the burden is, I mean, it's a denial of his, well, you'd have to separate the issues. There's the prudential issue that it's his petition for rulemaking that was denied by the agency. And so the adequacy of the agency's treatment of his petition is really the subject of the litigation. The only question is what's he. And it's no doubt that he had the right to file the petition. That's not the issue. No, it's not. But the issue is then what's his connection with his petition, in a sense? You know, what gives him an interest in challenging these rules? And his interest is direct in person on actual. He's a thyroid cancer patient, and he will be for the rest of his life. Maybe we can get closer to the merits. What about the 1997 rulemaking? You're out of time with respect to any kind of amendments to that or challenging, challenges to that, are you not? Well, we could not obviously petition for review for the adequacy of that 1997 rule, but the test is laid out in NRDC against NRC in 1981, so it's well established. Is our focus on the past or is our focus on new experience under the rule? In the 1997 document, everything that was said in that rulemaking, in a sense, was hypothetical because nothing, this regulatory regime, this health treatment regime, had not been set into place. Well, then why don't we get to the actual rulemaking that is the subject of this direct challenge. What's your position with respect to what might be arbitrary or capricious in the rulemaking or the determination made by the NRC in the current case? In the current case, there are at least two issues that I would bring to the court's attention. One is what I would call the hotel issue, and the other issue is what I would call the consistency with international standards. To the hotel issue, a 1997 rule assumed, postulated, basically a binary system. People would either be treated inside a hospital in radiological isolation where they would be released. There was no third way or fourth way or fifth way. Well, you brought that to the attention of the commission, and they heard from quite a wide variety of technical scientific people. Yes. And, obviously, you didn't persuade them. Well, no, actually, the hotel issue got raised by public comments in the limited proceeding. I would actually have, on the hotel issue, they didn't respond at all. No, they did not. You can read the denial from cover to cover, and there's not a word about it. The agency's brief says that the rules do not permit or encourage the release of patients to hotels, but the brief does not say that the agency prohibits it. And, in fact, there are comments from thyroid cancer patients who commented in the limited proceeding that they were encouraged or they were in support groups with other people who were encouraged, but that it's a real issue. And, in the International Radiation Protection Document 94, which is in the record, the ICRP says that some people, the ICRP says they're aware that some people are going to hotels as a way to save cost. So, you know, the international community had also identified this. So, as to the hotel issue, my understanding of your complaint isn't really an arbitrary, complicit complaint. It's the failure of the responsibility to deal with the issue at all. Yes. Yes. So, there is no response on that point at all, and it warrants a remand. The state farm standard, I think, is clear on that. And, as I said, the problem there. Response in the 97 rulemaking? There was not anticipated in the 97 rulemaking. Yeah, but there's no response in the current. In the current rulemaking, right. There's no. Current petition. There's nothing there in the denial. The agency's, you know, and as I said, the most direct thing the agency's brief says about it, which is obviously not entitled to deference, is that the rules don't permit or encourage it. But, you know, that's a careful statement. But, essentially, it hasn't been responded to either in the 97 or not at all. That's exactly right. It was not an issue in 97. Nobody that I'm aware of was aware of it. It was suggested by comments in this proceeding. Petitioner filed additional comments, which the agency said it considered, that said, hey, this is an issue that really ought to be examined because it calls into question a number of things. You know, that it's not a binary system, that there are other pathways, that the agency assumes in all its technical calculations that a person who's been irradiated stands or she stands a certain distance away behind a podium, you know, will give off certain doses. That contamination, which you get from close contact with a person who has been irradiated, is not a proper pathway for radiological risk. And it says that in the record at page 34, and it says that at page 38. But this is different. This shows that people can have intimate contact because they're cleaning rooms. They're separated, you know, across the 2-by-4 wall, the plasterboard wall, from somebody who may be irradiated. You come in contact with guests in elevators and lobbies. And so there are other pathways. So it's not only is it a new issue that was not anticipated, but it's an issue and that the agency has not responded to, but that it opens the door to, I think, the same kind of technical questions that there are about the adequacy of the technical explanation given by the agency. And that also goes to the international issue. The international issue says that based on the latest data that the dose to children and other vulnerable populations is really not as important as possible contamination and that there ought to be regulatory limits. So these issues in some way are related. But there the agency says the problem is that Mr. Crane was not asking for that. So this really was kind of off to the side of what he was asking for. Well, but, you see, he filed for it. The agency allowed him the opportunity to amend his filings. And this last filing we'll show you in the record. The last filing specifically says, you know, maybe I was wrong about simply asking for revocation. Maybe there are other things based on, to Judge Kleinfeld's question, maybe there are other things based on increased technology or other issues that ought to be evaluated. But as to this issue, they did respond at some length. And they came up with a guidance rather than a new regulation. That's exactly right. So it was not the same as the hotel issue. They were responsive. They were not unresponsive. They did. And they said that that would be more efficient. They said that that would be faster.  It's still up to the doctors to decide what to do. But then you do have an arbitrary and capricious issue, which runs into all sorts of deference problems and so on. Well, it runs into deference problems if there's an issue about the technological expertise. I don't know that it's the same deference problem. If you're saying that the agency recognizes it's a serious public safety problem, it's advising licensees about it. It's not insisting that licensees actually do anything about it. And if anybody violates the rules, nobody will be written up. Weren't there a range of responses and comments in this area, in the proceedings such as it was? Yes. The agency analyzed three options. The one option it did not analyze, Your Honor, was to issue the guidance and start a rulemaking. If you issued the guidance and started a rulemaking, you would tell the licensee community, this is important, we take it seriously, and we expect you to take it seriously because we're headed for rulemaking on this. Counselor, you're down to two minutes. I know you want to reserve. I do, if that's okay with you. You may do so, Counselor. Thank you, Your Honor. May it please the Court. My name is Robert Rader. I represent the Nuclear Regulatory Commission in the United States of America. I'd like to start immediately with the hotel issue, which has caused a little bit of concern and perhaps some confusion. Could we start with the standing issue just because it's obviously logically prior? I'm sorry? The standing issue, which you've raised. You'd like me to address that? Well, yes. Are you willing to say now in light of this latest information that there's no standing problem we can go on or what? There certainly is a major standing problem, Your Honor. The fact is there are, as the Court has pointed out, there are no medical affidavits in this case or declarations to show injury to the plaintiff for the likelihood of imminent concrete harm. What usually happens in a case of this kind, which is coming from the agency where there was no standing problem, where we don't really have a pleading, I mean usually people file this sort of pro forma petition. In what form does standing come in? In your experience or in the case law? How do you, in what form do these allegations get made? And suppose we had a factual dispute. What would we do with it? Well, ordinarily the standing would be made clear in the petition itself before the agency. No, no, but that doesn't matter because it doesn't have to have the standing before the agency. But the record would lay clear a standing so that when the record on appeal would be clear. I am a cancer patient. Here is the medical history regarding me. This is why you should be concerned about the problem. Well, I don't see any reason for that because he had no obligation to make it to the agency. Then he should have put it somewhere with his initial pleadings or with his reply brief. There's no medical affidavit, Your Honor. It's simply guesswork. I don't know what to make of the information that counsel submitted to the Court in his response to our little 20-inch letter. We were to give him leave to do it now and he was to submit affidavits which said approximately what we now seem to know in pieces. But you think he was standing then? No, no, I wouldn't because the most that a doctor could do at this point is provide the Court with likelihoods. And the Court has made clear in Summer v. Earth Island Institute that the Court is not to engage in that kind of probabilistic analysis. We dealt with a kind of a case where people – that was a different kind of a probability. That was a probability of something that was knowable. It was knowable but they didn't – rather than knowing it, they wanted to prove by probability, i.e., which of their members had this problem. Okay, this is not – it's only as knowable as it is. And if this person doesn't have standing – let's assume that his last – that thyroid cancer recurs sometimes as long as 25 years later in, say, 15% of the cases. Maybe that's a fact. I don't know if it is. And that he has some indication of some problem in his blood, which he's now saying, and he can get a doctor to say that. Would that be sufficient for you to prove that he has standing? No, it wouldn't, Your Honor. It's still guesswork. Let me point out an answer to Your Honor's question. So in other words, he has to have cancer at the time? Your Honor, let me point – let me give you the answer to your initial question, which is, in effect, who would have standing? Okay. Who would have standing? I can't stand here and represent who would not have standing in a future case. I can certainly tell the Court that there is a – there are a barn full of candidates. First of all, in looking through the papers that Mr. Crane has filed, I noticed there is a cancer – thyroid cancer survivors association. They have 5,000 members. Clearly, there would be an opportunity for organizational standing, so there would be a conscious – No, because that's what the Summer case was about, that they have to demonstrate that some member of that group actually had standing, so it doesn't get you anywhere. Well, of course – but it does, Your Honor, because those people are going to be in some form of active treatment. There are more than 10,000 thyroid treatments each year, 10,000. So it is your position that it has to be somebody who is currently in treatment? It's someone who is currently in treatment or a court would have to have some basis for determining a likelihood of future treatment, a likelihood of concrete and imminent harm. We also have medical licensees. We have hospitals which are licensed to possess and use these materials therapeutically. The doctors in those hospitals have standing. The medical organizations like the AMA or the American College of Nuclear Medicine would likely have standing on behalf of its members. The fact is Mr. Crane stands in isolation. The fact that he stands in isolation is more reflective of his substantive position than a problem with standing. There are plenty of people out there who could or would have standing. Mr. Crane's last treatment was 19 years ago. Well, he's just said otherwise. He's just said that he's had some blood tests that demonstrate that he has some issue. No, Your Honor. Respond to the 28J letter that he filed, or Mr. Chopra. He filed a letter in which he says thyroid globulin is a signal that the system still or again retains cancer cells. That simply does not create a sufficient nexus to his case that we should go back and revert to a system of thyroid cancer treatment using iodine-131 and how we release patients from hospitals. It's too big a jump. There's too much in the way. As Judge Kleinfeld pointed out, we don't even know what form of treatment would be used, God forbid, if Mr. Crane should have a recurrence. And counsel said in his brief, while this does not constitute a full-scale recurrence, it's not a recurrence of any kind. We're simply too far away. Do you know anything about this test? There are some tests that will only be positive for one thing. There are others, well, for example, a PSA test that may mean that a person has prostate cancer, but more frequently it just means benign enlargement of the prostate gland, not a very useful test. I don't know about this test. I do not, Your Honor. I must disavow medical knowledge, but I can say that that should have been placed in an affidavit. But even if that had been done, I strongly doubt that it would be sufficient in this case to show standing because there are too many layers of probabilities that have to be satisfied for Mr. Crane to meet standing. With regard to the hotel issue, which Your Honor has questions on, the record shows that Mr. Crane did not raise this issue in his initial petition in 2005. He filed a letter with the court, which is at ER 53, his record, page 53, after the rulemaking had begun a year later. And he said, You know, I just noticed that there's another letter in the record talking about people being assigned to hospitals by their doctors, and I'm worried about this too. He then sent another letter a little bit after that recanting the first letter and said, You know what, I was wrong. That was not in the record. It came from a website. So we have the initial letter saying there was something. The second letter is saying it's recanted. The fact is there is not a single reference in the record that says, My doctor sent me to a hotel. But there are a bunch of letters in the record regarding hotels. What are they? Your Honor, let me give you an example of that. The best example is at page 54 of Mr. Crane's excerpts. At the bottom of the page, the writer says, There are doctors who are telling patients to go to a hotel, or the patients decide on their own to do so to protect their families. That's all you'll find. There is not a single letter in there where a patient says, My doctor told me to go to a hotel. Every doctor who commented on the record said that this is not so. They don't do it. And this is simply not true. What do patients do if they don't have family to take care of them and deal with the thing properly and they come out of the hospital sick and weak? I would think kind of logical if you can afford it, check into a hotel instead of going back to your apartment, get room service so you don't have to cook for yourself. The record here shows, Your Honor, that about a third of the patients are not released from hospitals immediately after treatment. They are kept in hospitals. So the people you're talking about are being kept in hospitals until they are safe for medical release. Well, there are a bunch of other letters which say, from people who are advised thyroid patients. Yes, Your Honor. And again. About the hotel issue, saying, I got a call from one patient who checked herself into a hotel. Exactly, Your Honor. That's exactly what you'll find. You'll find anecdotal information about other people talking about other people. You will not find one letter that says, my doctor instructed me it was okay to go to a hotel. And that's why the NRC considered it that way in the rulemaking. And by the way. The NRC didn't consider it at all in the rulemaking. They didn't. They didn't say that either. They said nothing. Your Honor, the NRC considered the matter to have been dropped when Mr. Crane wrote his second letter recanting the issue. Wait a minute. I'm confused about what you just said. If the NRDC looked at it and said, well, the doctors don't spring them. They don't let them out of the hospital. If they don't have a place where they can go home and be separated from people and get the care and also distance they need, if they're still radioactive and they can't get proper care at home, the hospitals don't let them out. They don't let them go to a hotel. Is that there or isn't it there? The NRC considered the issue, Your Honor, but they didn't consider it necessary to write about it in denial. How do we know it was considered? Oh, I'm sorry. I think we both asked the same question. How do we know it was considered by the NRC? There's nothing in the record to show that the NRC did, in fact, consider it because they didn't respond to this in their decision. But the fact is this is not an adjudicatory decision. Agencies in denying rulemaking are summary in nature. This actually is a much more extended procedure. So your ultimate position is that when there's a request for rulemaking, the general administrative law requirement that you look at the relevant considerations and say what you think about them doesn't apply. I would say that the rules regarding adjudications don't apply. That's true. Agencies are not required to give the detailed reason that they give when they make an adjudicatory decision. It's not an adjudicatory decision. It's a rulemaking decision. Exactly. The question is if this was a rulemaking and this issue had been raised and it wasn't responded to, would that be a problem? We'd have a different case. This was a denial of rulemaking, Your Honor. It's not a rulemaking. I understand that, but that's not what I'm asking you. I'm asking you whether a different principle applies as a matter of administrative law with regard to the obligation to at least respond to serious issues raised in the record. I don't agree it was a serious question. But, yes, in answer to your question, the obligation would be less in the denial of rulemaking than in actual rulemaking. That is correct. So there was no obligation. So, therefore, it's okay. I mean, let's suppose we agree. Let's suppose that we had a statement from, some authoritative statement from a doctor that he, in fact, suggests that patients do this, which is not in the record. And the agency ignored it. Would that be all right? No, Your Honor. It has to be weighed on up. Obviously, the standard is arbitrary and capricious. And that has to be determined on a scale of the importance of the issue in the record. Is there a different standard with regard to the obligation to just look at the relevant considerations and respond to them? That's not a substantive requirement. It's a procedural requirement. Yes. I'm simply suggesting that in a denial of rulemaking, which is extraordinarily discretionary under the APA and an extraordinarily narrow standard of review, the obligation to explain the agency's decision is not as a procedural rulemaking case where the agency has undertaken the obligation to comply with APA rulemaking requirements. With regard to the standing issue, just the ‑‑ I'd just like to point out that the courts have frequently ruled that the representations of counsel are inadequate where they require knowledge beyond his ken, referring to Sierra Club v. EPA 292 F. 3rd 895 at page 901, D.C. Circuit case in 2002. I'd also point out that this case, that this court has required affidavits in previous cases, conclusive affidavits and not inconclusive affidavits like the ones that were rejected in Snake River in 1992, 796, a decision of this court in 1993. As the court said in Lujan, standing is not merely a pleading requirement. It's an indispensable part of the plaintiff's case. So it's Mr. Crane's burden of proof. I don't think he satisfies that burden of proof with the response to the 28J letter that was filed by counsel, and I don't think it could be substantively fulfilled by post‑hearing submission. So I don't agree that that would be appropriate. The Lujan case says that each element must be supported in the same way as any others, in which he bears the burden of proof with the manner and degree of evidence required in successive stages. Are those cases that arose like this one did? I'm sorry, Your Honor? Are those cases that arose as this one did on a petition for review in the Court of Appeals? No, Your Honor, but standing constitutionally is required in any case. Oh, I understand that, but that's why I'm raising the procedural question. It's just an odd business, and there must be some track record. I mean, this happens not infrequently, but I looked and I really couldn't find any pleading requirement for a petition for review unlike a complaint in district court. And there does seem to be some support for the notion that it could be done in briefs. I agree with that, Your Honor, but the fact is that it is the petitioner's burden, and he must satisfy that burden. Certainly, petitioner must anticipate that when he comes before the court, he's going to have to satisfy standing requirements because they are constitutional requirements. It doesn't he doesn't he can't say I didn't anticipate that it would be raised by the government or I waited until the government raised it. He has an affirmative obligation. Well, he did say from the beginning that he had he had been a thyroid patient and he had at least one recurrence, and that's basically what he said. I beg your pardon, Your Honor. He's not had a recurrence. He said he had. I think Your Honor misunderstood. He said in his 20HA letter that he has thyroglobulin in his blood. He has not had a recurrence of his cancer. He's been treated in 1989 through 1991 and not had a recurrence. On page 5 of his reply brief, he says, Petitioner is a thyroid patient now in remission. He has already had one such recurrence. I stand corrected. I don't know when that recurrence was. I have not seen it in the rulemaking record. I have seen no reference to that whatsoever. I stand corrected. I don't know when that was or when it was. We can ask Mr. Chopko about that. Anything from other counsel? No, I think Your Honor has the case. Thank you, Your Honor. Thank you very much. Mr. Chopko, you have some reserve time. Thank you. To the question, there is no basis under the Hobbs Act review for making a factual record. The record comes up from the agency. Mr. Crane is a thyroid cancer patient. He had a recurrence, I believe, 16 years ago, maybe 19 years ago. It was the last time he had a full-scale recurrence of his cancer. The reference was made to 19 years ago earlier. Is that what you're referring to? I was looking in my briefing to find the exact date. I don't. I mean, he's here. I can ask him. The recurrence was 19 years ago, so you're not talking about a subsequent recurrence? Just a year. Okay. 1991 was the last time that he had. 1991. Yes. And what the blood test signaled is that his system still retains the cancer. And, again, my information suggests that the doctor could not pinpoint where it was so could not aggressively go after it. He chose instead to suppress it. If you've got somebody with a commitment to the issue, with a personal stake in the outcome, an actual cancer patient, to have somebody who's actually in treatment, I suggest that by the time the court got around to the case, that person would be in remission or that person, unfortunately, could be dead. So you have a situation when you're dealing with cancer where you have a lifetime of monitoring and possible treatment. That's the best you can do for somebody who shows an actual interest in the subject of the rulemaking. What's your answer to the government's argument that with an association of patients who have the disease you ought to be able to find someone or get associational standing? It is possible, but in a sense that's almost form over, in my view, form over substance. A lot of standing seems like that, but, nevertheless, we're stuck with it. That's a fair point, Your Honor, but, again, Earth Island says he has to have standing to seek the relief that he seeks. This is a denial of his petition for rulemaking, and the issue I think is fairly stated as does he state a personal interest in the subject of the rulemaking. It's not academic. He's not a private attorney general. This is about him. This is about his life. That's why he filed the petition. Thank you very much, Counsel. Thank you, Your Honor. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Kleinfeld, Berzon